## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

GAIGE GROSSKREUTZ;

     Plaintiff;

v.

                                   COMPLAINT
                                   JURY TRIAL DEMANDED

THE CITY OF KENOSHA, a municipal corporation;
KENOSHA COUNTY, a municipal corporation;
DAVID BETH, in his individual and official capacities;
DANIEL MISKINIS, in his individual and official capacities;
ERIC LARSON, in his official capacity as Chief of Police for Kenosha Police Department;
JOHN & JANE DOE POLICE OFFICERS of the Kenosha Police Department and the Kenosha Sheriff's Department 1-100,
     Defendants.

---

## COMPLAINT AND JURY TRIAL DEMAND

---

Plaintiff Gaige Grosskreutz, by and through his attorneys, Kimberley Cy. Motley of Motley Legal Services and E. Milo Schwab of Ascend Counsel, LLC, respectfully alleges for his Complaint and Jury Trial Demand as follows:

### INTRODUCTION

"We appreciate you guys - we really do"

These were the words of Kenosha law enforcement officers - words of encouragement, appreciation, and thanks, spoken to Kyle Rittenhouse and a band of white nationalist vigilantes on the evening of August 25, 2020.

Earlier in the evening Kenosha law enforcement officers and white nationalist militia persons discussed and coordinated strategy. It was not a mistake that Kyle Rittenhouse would kill

1

two people and maim a third on that evening. It was a natural consequence of the actions of the Kenosha Police Department and Kenosha Sherriff's office in deputizing a roving militia to "protect property" and "assist in maintaining order."

## JURISDICTION AND VENUE

1.  Jurisdiction of this Court is invoked pursuant 28 U.S.C. §§1331 and 1343(a).

2.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

3.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred in this District.

## PARTIES

4.  Plaintiff Gaige Grosskreutz is a citizen of the United States who resides in the state of Wisconsin.

5.  Defendant City of Kenosha is a municipality in the state of Wisconsin. Kenosha operates the Kenosha Police Department ("KPD"), which in turn sets city-wide policies for the conduct of police officers employed by the City of Kenosha.

6.  Defendant Kenosha County is a municipality in the state of Wisconsin. Kenosha County operates the Kenosha County Sheriff's Department, which in turn sets policies for the conduct of sheriff's deputies employed by the Kenosha County Sheriff's Department.

7.  Defendant DAVID G. BETH was the duly elected Sheriff of Kenosha County, Wisconsin. Defendant Beth had the authority to make and enforce policies of the

Kenosha County Sheriff's Department. Mr. Beth is sued in his individual and official capacities.

8.      Defendant DANIEL G. MISKINIS was the Chief of Police for the Kenosha Police Department. Defendant Miskinis had the authority to make and enforce policies of the Kenosha Police Department for all times relevant to this complaint. Mr. Miskinis is sued in his individual and official capacities.

9.      Defendant ERIC LARSEN is the acting Chief of Police for the Kenosha Police Department. He is sued in his official capacity.

10.      Defendants JOHN AND JANE DOE POLICE OFFICERS are unknown law enforcement officers employed by Defendant Kenosha Police Department and/or Defendant Kenosha County Sheriff's Department.

**FACTS**

**Kenosha Police Shoot Jacob Blake multiple times in the back, Sparking Protests**

11.      On Sunday, August 23, 2020, Jacob Blake was shot seven times in the back by officer Rusten Sheskey who works for the Kenosha Police Department ("KPD"). The events of Mr. Blake's attack were captured on video by a bystander and have renewed our national debate on systematic racism and police brutality directed at Black Americans. Mr. Blake was transported to a local hospital, where he underwent multiple surgeries. He remains paralyzed.

12.      Almost immediately after the shooting, neighbors and Kenosha residents began to demonstrate in response to this police brutality. Demonstrators first gathered at the site of Mr. Blake's shooting and later went to the courthouse located in downtown Kenosha.

13.     Officers from the KPD and the KCSD were dispatched to monitor the demonstrations, police the actions of individuals present, and disperse the crowds.

14.     The KPD and KCSD officers at the scene were antagonistic toward the anti-police brutality demonstrators, who were voicing their outrage at the racist and systemic violence conducted by the very officers who were policing the demonstrations.

15.     An emergency overnight curfew of 10:15 p.m. was put in place. The curfew was aimed at anti-police brutality protestors and not actually directed at, or enforced against, others in the City violating the order.

16.     Officers from the Kenosha Police Department and the Kenosha County Sheriff's Department fired tear gas and rubber bullets into the crowds to break up the anti-police brutality demonstrations, and they arrested a number of anti-police brutality demonstrators.

17.     On Monday, August 24, 2020, the demonstrations continued. Defendant Beth put in place an 8 p.m. curfew. Again, the curfew was aimed at only anti-police brutality protestors.

18.     That curfew remained in effect on August 25, 2020.

**Defendants Know Armed Individuals Plan to Patrol Kenosha and Have Threatened Harm to Citizens**

19.     The demonstrations continued on August 25, 2020.

20.     That evening, armed individuals descended on Kenosha. They could be seen patrolling the streets in and around the demonstrations, brandishing weapons, threatening residents, and pointing weapons at peaceful demonstrators without provocation.

21. The armed individuals had arrived in part based on a Facebook post by Kevin Mathewson, a former Kenosha City Council member, on behalf of a militia group he formed called the Kenosha Guard. Mathewson put out a call on Facebook for "patriots willing to take up arms and defend our City tonight against the evil thugs." He received hundreds of online responses, including many hundreds of people indicating that they would be attending.

22. The responders to Mathewson's post made clear that they intended to patrol the demonstration armed, and with the intent to kill. Responses included the following:

   i. "Counter protest? Nah. I fully plan to kill looters and rioters tonight. I have my suppressor on my AR [Assault Rifle], these fools won't even know what hit them."

   ii. "It's about time. Now it's time to switch to real bullets and put a stop to these impetuous children rioting."

   iii. "Use hollow points, they expand on contact."

   iv. "Armed and ready. Shoot to kill tonight.

23. Defendants knew about the plans and intentions of the armed individuals, including the social media posts, and the plans and intentions of the pro-militia armed individuals that descended on downtown Kenosha.

24. Mathewson who is a former Kenosha alderman, was known to the Defendants, and speaks regularly with Defendant Miskinis.

25. Mathewson, calling himself the Commander of the Kenosha Guard, emailed Defendant Miskinis and Joseph Nosalik, KPD's Public Information Officer. The email stated,

   "Chief Miskinis: As you know, I am the Commander of the Kenosha Guard, a local militia. We are mobilizing tonight and have about 3,000 RSVP's. We have

volunteers that will be in Uptown, downtown, and at the entrances to other neighborhoods."

Mathewson also posted the email as an open letter to the Kenosha Chief of Police on social media.

26.  The email and social media post made clear that these "volunteers" would not be there to protect their own homes or businesses, and that they had not been hired by any local business to secure property. Instead, they intended to patrol the streets, acting as armed law enforcement officials.

27.  Neither Defendant Miskinis nor Defendant Beth made any attempt to dissuade Mathewson or any other armed individuals from showing up in Kenosha to patrol the streets.

28.  Defendants Miskinis and Beth acknowledged that the KPD and KCSD were aware that pro-militia, armed individuals intended to patrol and then did patrol downtown Kenosha.

**Rittenhouse Shoots Gaige Grosskreutz and Two Others**

29.  Among the armed individuals who arrived in Kenosha on August 25, 2020 was Kyle Rittenhouse.

30.  Rittenhouse was a 17 year old from Antioch, Illinois.

31.  By his appearance, Rittenhouse was obviously a minor.

32.  Rittenhouse possessed a Smith & Wesson AR-15 style .223 rifle, with a magazine holding 30 rounds of ammunition. This weapon was developed in the late 1950s as a weapon of war.

33.  Rittenhouse was brandishing his gun openly and conspicuously, strapping it over his shoulder using a tactical sling designed to position the rifle at the center of his chest for

rapid elevation and positioning. The rifle was visible at all times across his body or in his hands.

34. Rittenhouse was in clear violation of the law, which prohibits a minor from possessing or displaying such a gun.

35. Numerous KPD and KCSD officers saw Rittenhouse before and after the shootings that night. Despite being in clear violation of Wisconsin law, Rittenhouse was not asked for identification, was not questioned, was never detained, and was not disarmed.

36. Instead, Defendants allowed Rittenhouse to patrol the streets of downtown Kenosha with his deadly assault rifle, they invited him in, deputized him, conspired with him, and ratified his actions.

37. As a result of Defendants' actions, within the zone Defendants controlled, Rittenhouse shot at four Kenosha-area residents, killing two and seriously injuring a third.

38. At around 11 p.m., without provocation, Rittenhouse pointed his gun at an unarmed demonstrator heading to his car to go home.

39. Around 11:45 p.m., Rittenhouse shot Joseph Rosenbaum in the parking lot of an auto dealership. Rosenbaum was killed.

40. Instead of seeking medical attention, or any other form of aid, Rittenhouse called his friend Dominic Black, told Black that he had just killed someone, and then fled the scene.

41. Rittenhouse ran from the scene of the Rosenbaum shooting with his assault rifle in his hands. Instead of slinging it over his back as he had all night, he held it in a ready position and aimed it at people as he ran. People were yelling that Rittenhouse had just shot someone.

42.  Rittenhouse stumbled and fell to the ground, and several citizens approached him in an attempt to disarm him.

43.  Anthony Huber was one of those individuals. Anthony approached Rittenhouse to disarm him, stop the shooting, and save the lives of others.

44.  Anthony Huber was a hero.

45.  As Anthony was reaching for Rittenhouse's rifle to pull it away, Rittenhouse shot him in the chest.

46.  Seeing this murder, Gaige Grosskreutz approached a still seated Rittenhouse.

47.  Grosskreutz put his hands in the air in an effort to show that he was not attacking Rittenhouse.

48.  Rittenhouse instead shot at him, thankfully missing his head and central mass but unfortunately striking Grosskreutz in the arm. Grosskreutz sustained serious injuries and lost 90% of his right bicep.

49.  As a true medic and not someone running around with an AR15 claiming to be a medic, Grosskreutz had a tourniquet in his medic bag.

50.  But for his training as an EMT, Grosskreutz would have likely been Rittenhouse's third killing.

51.  Nonetheless, Grosskreutz's life has been changed immeasurably.

**Defendants Authorize Rittenhouse's Shootings**

52.  Defendants did nothing to stop Rittenhouse's illegal conduct. They did not arrest him for illegally carrying a gun. They did not disarm him. They did not limit his movement in any way. They did not question him. They did not stop him from shooting individuals

8

after he started. They did not arrest him, detain him, or question him even after he had killed two people and nearly killed Grosskreutz.

53. Instead, Defendants deputized Rittenhouse and other armed individuals, conspired with them, and ratified their actions by allowing them to patrol the streets armed illegally with deadly weapons and shoot and kill innocent citizens.

54. Among other things, Defendants directed their curfew order only at people protesting Defendants' own police violence, and not at Rittenhouse and others, who were supporters of law enforcement.

55. Rittenhouse and others were subject to a different set of rules and were allowed to move about freely in areas controlled by Defendants.

56. For example, at 9:57 p.m., a Kenosha Police Sergeant sent a message to all officers through the Department's internal messaging system noting the presence of armed individuals patrolling the streets in violation of the curfew order.

57. Rather than take any steps to detain, dissuade, or disarm these armed individuals, a KPD Sergeant made clear that they were not to be detained, dissuaded, or disarmed, calling the armed individuals in blatant violation of the curfew order "very friendly."

58. Likewise, at 11:26 p.m., callers reported that members of the armed individuals had "slashed tires" in a nearby area. But, the Defendants did nothing in response to this conduct, let alone arrest the perpetrators.

59. Instead, at approximately 11:30 p.m., about fifteen minutes before Rittenhouse shot Rosenbaum, Huber, and Grosskreutz, KPD and KCSD officers were talking to Rittenhouse and the other armed individuals who had congregated in the parking lot of a private business.

60. Despite the fact that the armed individuals were in violation of the curfew order, the officers and deputies communicated their full support and appreciation for Rittenhouse and others.

61. In video footage taken at the scene, officers can even be heard asking armed individuals if they needed water and other supplies. Rittenhouse can be seen telling the officers that they did need water, which officers gave them.

62. Rittenhouse walked right up to the police vehicles. Despite his obviously tender age, he was not asked for identification to demonstrate that he could lawfully possess an assault rifle.

63. The officers not only provided armed individuals with water, but they voiced their support and appreciation for the actions of Rittenhouse and others, saying: "We appreciate you guys, we really do."

64. At no point did the officers tell the militia members to go home.

65. At no point did the officers tell the militia members to stop harassing and threatening other demonstrators.

66. At no point did the officers tell the militia members that their assistance was not needed.

67. Instead, they embraced these armed vigilantes as part of their effort to police the streets and confront anti-police brutality protesters.

68. Needless to say, KPD and KCSD officers did not offer assistance or appreciation to any protestors.

69. At the same time the officers were handing out assistance and praise to the armed individuals, including Rittenhouse, they can be heard over loudspeakers in their

armored vehicles ordering the protestors to disperse: "This is the last warning. You will disperse." And: "This area is closed you are trespassing, leave now."

70. No such warnings or threats were made to the armed individuals.

71. The message was clear. The armed militia members were part of the team and were not part of the public. Only law enforcement officers were exempt from the curfew order, and by enforcing the curfew on protesters while providing supplies to Kyle Rittenhouse and his fellow militia members, the police confirmed their earlier statements of coordination and deputization.

72. The KPD and KCSD officers deliberately orchestrated these circumstances. A clear message was sent that anti-police brutality demonstrators were required to disperse, while armed individuals who supported law enforcement could roam free and assist the officers. These events directly led to Joseph Rosenbaum and Anthony Huber's deaths and the serious bodily injury to which Gaige Grosskreutz was subjected to.

73. Before the fatal shootings, one of the armed individuals, Ryan Balch, was interviewed. Balch said the following: "You know what the cops told us today? They were like, 'We're gonna push 'em down by you, 'cause you can deal with them, and then we're gonna leave.'"

74. And that is exactly what happened. Defendants ordered the protestors to move south, kettling them into a confined area, where they were met by the violence perpetrated by Rittenhouse and the other armed individuals.

75. Upon information and belief, several members of the militia were off-duty police officers, sheriffs, and other law enforcement officers.

76. At all times, Defendants, Rittenhouse, and others knew and understood what Defendants meant when they told heavily armed private citizens to "deal with" the protestors. In this manner, Defendants, Rittenhouse, and others arrived at a plan to collectively use force and state authority against the protestors.

77. For example, Rittenhouse's own lawyers have stated that the police "maneuvered a mass of individuals down the street towards the auto shops" where the armed individuals had gathered.

78. As a result, Defendants invited, deputized, authorized, conspired with, and ratified the actions of Rittenhouse, a child illegally in possession of an assault rifle, who roamed the street in violation of an emergency curfew order, threatening protesters with his weapon of war, and shooting innocent civilians, killing two, seriously injuring a third, and narrowly missing a fourth.

79. To make matters worse, when Huber and Grosskreutz were shot, police officers from both the KPD and KCSD were at the scene. Protestors yelled to the officers that Rittenhouse had just shot people. Remarkably, the officers did nothing to stop Rittenhouse, let alone question him, or arrest him. Instead, officers spoke to Rittenhouse and then let him walk away and flee across Wisconsin stateliness to Illinois.

80. The only reason Defendants allowed Rittenhouse to walk away after shooting three people was because he was white and because he was affiliated with their compatriots, who had Defendants' explicit support.

81. Long after he had been allowed to leave the scene and the state, Rittenhouse was finally arrested and charged with murder and other crimes by the Kenosha County District Attorney's Office.

82. By inviting, deputizing, conspiring with, and ratifying the actions of armed individuals, who were empowered to patrol the streets of Kenosha, Defendants created an extremely and obviously dangerous and deadly environment, which led directly and foreseeably to the shootings of Anthony Huber and others.

83. Defendants' open support of and coordination with the armed individuals in the minutes and hours before the shootings deprived Anthony Huber and the other protestors of the basic protections typically provided by police. It was a license for the armed individuals to wreak havoc and inflict injury.

84. Rittenhouse's own lawyers have blamed the shootings on Defendants, highlighting Defendants' "abject failure to ensure basic law and order to citizens."

85. However, it was not a failure to ensure basic law and order. It was a deliberate choice to attempt to privatize their desired use of the force of the state to punish protesters for the content of their message in opposition to police violence and racism endemic in the Kenosha Police Department.

86. Defendants have continued their disparate treatment of Black people, even after the deaths of Huber and Rosenbaum and shooting of Grosskreutz. For example, Defendant Miskinis has refused to publicly condemn the crimes of Rittenhouse or the other armed individuals, and instead has ratified that misconduct. Indeed, he has defended the armed individuals as citizens exercising their constitutional rights. The protestors received the opposite treatment from Defendant Miskinis.

87. Moreover, in his first press conference after the shooting, Defendant Miskinis refused to make any statements condemning or even dissuading the armed individuals, even when he was specifically asked if he wanted armed vigilante groups to be present again the next night of protests.

## Racial Discrimination and Viewpoint Discrimination

88. If Kyle Rittenhouse were Black, Defendants would have acted much differently.

89. If a Black person had approached police with an assault rifle, offering to patrol the streets with the police, he most likely would have been shot dead.

90. If a Black child had shot three citizens with an assault rifle and was seen walking away from the scene of the shooting with the assault rifle in hand, while other citizens yelled he was an active shooter, he would have been shot dead.

91. In none of these circumstances would Defendants have permitted the individual to roam the streets, illegally and heavily armed, shoot civilians, and then walk past a dozen officers, talk to them, and simply go home.

92. One need not look any further than the very event that gave rise to the protest at which Joseph Rosenbaum and Anthony Huber were killed and Gaige was maimed: although Jacob Blake was not at the site of a shooting, possessed no gun, brandished no weapon, had not shot anyone, and was climbing into his own car with two children, Blake was shot in the back seven times by officers employed by Defendant KPD.

93. By contrast, seventeen-year-old Rittenhouse was walking away from the scene of a double homicide with an assault rifle in his arms, and he was permitted to simply walk away.

94. Jacob Blake is Black. Kyle Rittenhouse is White.

95. Moreover, the demonstrators were a diverse group of citizens protesting police violence against Black people, which included many Black-Americans and other people of color. They were protesting, in part, the racial discrimination of Defendants KPD and KCSD, and their officers, as exemplified by the shooting of Jacob Blake.

96. The armed individuals were all White.

97. Similarly, the protestors were advocating a viewpoint critical of the police, including Defendants KPD and KCSD. The armed individuals espoused a viewpoint that was avowedly pro-police.

98. The difference in treatment of the two groups was stark. The White, pro-police armed militia was allowed by Defendants to patrol the streets with weapons of war, participating in the police action, and threatening and inflicting violence on innocent civilians; while the diverse group of protestors criticizing police actions were ordered to disperse because they were violating the curfew order. No such orders were given to the pro-police individuals, who were in violation of the curfew as well.

99. The protestors were also treated differently than the armed individuals in terms of who was subject to arrest. In the days after the protests began, more than 150 protestors were arrested for allegedly violating the curfew order. Not a single one of the armed individuals was arrested by Defendants for violating the same curfew order.

100. Many of the armed individuals with whom the Defendant departments had allied themselves were avowed racists.

101. Among the armed individuals present at the protests was Ryan Balch, a member of the Boogaloo Bois who could be seen patrolling the streets with Rittenhouse. The Boogaloo Bois are a right-wing militia group whose adherents include neo-Nazis and

white supremacists. According to Balch, as many as 32 members of the Boogaloo Bois were in Kenosha patrolling the streets.

102. In the months after he killed Joseph Rosenbaum and Anthony Huber and maimed Gaige Grosskreutz, Rittenhouse was seen in a bar in his hometown flashing an "OK" sign, a symbol of white supremacy/white power.

103. Soon after, Rittenhouse flew down to Miami to meet with Enrique Tarrio, the leader of the Proud Boys, a white supremacist hate group.

104. Defendant KPD's support of, and coordination with, the armed individuals was a product of its systemic, racially discriminatory policies and practices.

105. The KPD has just eight Black police officers, out of a force of more than 200 officers. It has never had a Black person in top leadership positions, including police chief, assistant chief, or police inspector.

106. Christopher Carter, a former Black police officer in the KPD who retired in 2011, has said he was consistently subjected to racist aggression, including being called a "n*****," was discriminated against during his time at the KPD, and witnessed racist policing practices toward civilians.

107. In a recent article in the Washington Post, six current and former officers "described a department at odds with people of color, both inside and outside its ranks, with some officers routinely using racist language and excessive force." One of the former officers stated, "You have officers there who openly admit to pulling someone over because they're Black and driving a nice car. And these are officers who train new officers."

108. Just eleven days before Jacob Blake was shot, a woman was arrested for filming police officers engaging in threats and physical abuse during the arrest of a Black man. Her video footage captured a KPD officer punching a man in the ribs twice after he had already been handcuffed. When she was ordered to disperse, she responded, "We're not moving until we know he's safe!" An officer responded, "Do you want to get shot?"

109. For his part, Defendant Beth has his own history of racially discriminatory conduct as the Kenosha County Sheriff. In 2018, two Black woman and three Black men were apprehended after a shoplifting incident and a high-speed chase. The youngest individual arrested was 16 years old. In comments after the arrest, Defendant Beth stated that it was time to "stop being politically correct," and that "these people have to be warehoused."

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

110. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

111. Defendants acting in concert with each other and other co-conspirators—including Rittenhouse, Mathewson, members of the Kenosha Guard, Proud Boys, Boogaloo Bois, and other armed individuals—reached an agreement among themselves to deprive Grosskreutz of his constitutional rights, all as described in the various paragraphs of this Complaint.

112. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Grosskreutz of his constitutional rights.

113.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

114.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

115.    As a direct and proximate result of the illicit prior agreement referenced above, Grosskreutz's rights were violated and he suffered injuries, including emotional distress and serious bodily injury.

116.    Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; Larsen, acting in his official capacity; and by employees and contractors of the Kenosha Police Department and Kenosha County Sheriff's Department, including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; and the City of Kenosha and County of Kenosha.

117.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.


**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1985(3)**
**CONSPIRACY TO OBSTRUCT JUSTICE BASED ON INVIDIOUS DISCRIMINATION**

118.  Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

119.  Defendants are "persons" as that term is used in 42 U.S.C. §1985.

120.  Defendants, acting in concert with each other and other co-conspirators—including Rittenhouse, Mathewson, members of the Kenosha Guard, Proud Boys, and Boogaloo Bois, and other armed individuals—reached an agreement among themselves to deprive Grosskreutz of his constitutional rights and equal protection of the laws, all as described in the various paragraphs of this Complaint.

121.  In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Grosskreutz of these rights.

122.  In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

123.  The conspiracy between Defendants and the other co-conspirators set forth above, and the actions taken in furtherance thereof, were motivated by racial animus.

124.  Specifically, working in concert with these others, Defendants targeted individuals of color and individuals allied with them in protest against racial discrimination, including Grosskreutz, by creating a dangerous environment in which injury to Grosskreutz and others was highly likely. They did this by permitting the all-White armed individuals— many of whom had openly espoused racist and violent intentions—to taunt, threaten and monitor the diverse group of protestors, by permitting the all-White armed individuals to patrol the streets like deputized police officers, by offering the all-White armed individuals assistance and praise while simultaneously ordering protestors to

disperse, and by ultimately corralling the protestors and funneling them toward the all-White armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the racially diverse group of protestors were arrested for violating Defendants' curfew order. Not a single one of the all-White armed individuals was arrested for violating the same curfew order.

125.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

126.    As a direct and proximate result of the illicit prior agreement referenced above, Grosskreutz's rights were violated and he suffered injuries, including emotional distress and severe bodily injury.

127.    Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; Larsen, acting in his official capacity; and by employees and contractors of the Kenosha Police Department and Kenosha County Sheriff's Department, including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; and the City of Kenosha and County of Kenosha.

128.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.


**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**

## EQUAL PROTECTION

129. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

130. In the manner described in this Complaint, Defendants denied Grosskreutz equal protection of the law in violation of the Fourteenth Amendment of the United States Constitution.

131. Defendants' conduct was motivated by racial animus and constituted purposeful discrimination, and it also affected Grosskreutz and the racially diverse group of protestors in a grossly disproportionate manner as compared to similarly situated White individuals.

132. Specifically, working in concert with these others, Defendants targeted individuals of color and individuals allied with them in protest against racial discrimination, including Grosskreutz, by creating a dangerous environment in which injury to Grosskreutz and others was highly likely. They did this by permitting the all-White armed individuals—many of whom had openly espoused racist and violent intentions—to taunt, threaten and monitor the diverse group of protestors, by permitting the all-White armed individuals to patrol the streets like deputized police officers, by offering the all-White armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the all-white armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the racially diverse group of protestors were arrested for violating Defendants' curfew order. Not a single one of the all-White armed individuals was arrested for violating the same curfew order.

133. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

134. As a direct and proximate result of the conduct referenced above, Grosskreutz was deprived of equal protection of the laws, and he suffered injuries, including emotional distress and serious bodily injury.

135. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.


**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**FIRST AMENDMENT RETALIATION**


136. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

137. In the manner described in this Complaint, Defendants subjected Grosskreutz and the other protestors to discriminatory and retaliatory treatment based on their opinions critical of police violence, in violation of the First Amendment of the United States Constitution.

138. Grosskreutz and the other protestors participated in rallies and demonstrations in downtown Kenosha advocating a viewpoint critical of the police, including Defendants KPD and KCSD, similar to the national and worldwide protests against police violence

that began in the summer of 2020. Such conduct is protected by the First Amendment of the United States Constitution.

139. The armed individuals espoused a viewpoint that was avowedly "pro-police."

140. Defendants subjected Grosskreutz and other peaceful protestors to discrimination and retaliation because of their viewpoints critical of police. They did this by permitting "pro-police" armed individuals to taunt, threaten and monitor the diverse group of protestors without consequence, by permitting the "pro-police" armed individuals to patrol the streets like deputized police officers, by offering the "pro-police" armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the "pro-police" armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the protestors voicing criticism of racist and violent police conduct were arrested for violating Defendants' curfew order. Not a single one of the "pro-police" armed individuals was arrested for violating the same curfew order.

141. The protected speech of Grosskreutz and the other protestors, and the viewpoint critical of police that they expressed, was a motivating factor in Defendants' disparate, discriminatory and retaliatory treatment of the protestors.

142. The Defendants' retaliatory actions in response to Grosskreutz and the other protestors' protected speech have had a chilling effect that acts as a deterrent to free speech.

143. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Huber and others.

144.    As a direct and proximate result of the conduct referenced above, Grosskreutz's First Amendment rights were violated, and he suffered injuries, including emotional distress and serious bodily injury.

145.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.


**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**DEPRIVATION OF DUE PROCESS**


146.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

147.    In the manner described in this Complaint, Defendants allowed Rittenhouse and other illegally armed individuals to patrol the streets of downtown Kenosha with deadly weapons, inviting those individuals to use police powers, deputizing them, conspiring with them, and ratifying their actions.

148.    Defendants even informed Rittenhouse and these armed individuals that they would funnel demonstrators toward them to be dealt with.

149.    The misconduct described in this Count created the danger faced by Grosskreutz and other peaceful demonstrators who were present.

150.    In addition, the misconduct described in this Count shocks the conscience and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

151. As a direct and proximate result of the conduct referenced above, Rittenhouse shot and maimed Grosskreutz.

152. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and the Kenosha Police Department, and the County of Kenosha and the Kenosha County Sheriff's Department, in the manner more fully described below in Count VII.

## SIXTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## FAILURE TO INTERVENE

153. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

154. In the manner described in this Complaint, Defendants had knowledge that conspiratorial wrongs were about to be committed.

155. Each of the Defendants had the power to prevent or aid in preventing the commission of those wrongs.

156. Defendants neglected to prevent or aid in preventing these wrongful acts where the wrongful acts were committed and could have been prevented by reasonable diligence.

157. As a direct and proximate result of the conduct referenced above, Grosskreutz's constitutional rights were violated, and he suffered injuries, including emotional distress and significant bodily injury.

158. As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent them in court proceedings and incurred expenses associated with these proceedings and prosecuting the instant case.

## SEVENTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## MUNICIPAL LIABILLITY/MONELL CLAIM

159.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

160.    As described more fully herein, Defendants City of Kenosha and County of Kenosha are themselves liable for the violation of Grosskreutz's constitutional rights.

161.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendants City of Kenosha and County of Kenosha, as well as by the actions of policy-making officials for Defendants City of Kenosha and County of Kenosha.

162.    At all times relevant to the events described above and for a period of time prior and subsequent thereto, Defendants City of Kenosha and County of Kenosha failed to promulgate proper or adequate rules, regulations, policies, and procedures to ensure the protection of equal protection, first amendment, and other constitutional rights of protestors and other individuals engaged in demonstrations and rallies on issues of public interest; to protect protestors and other individuals engaged in demonstrations and rallies on issues of public interest, including from counter-protestors and other individuals whose actions and presence is likely to create danger and result in violence; to ensure the equal enforcement (or non-enforcement) of curfew orders; to ensure decision-making free of racial discrimination as related to the monitoring and supervision of protests and demonstrations; to ensure decision-making free of viewpoint discrimination as related to the monitoring and supervision of protests and demonstrations; to protect the free speech rights of all persons regardless of race or

viewpoint; and to protect against the likely violence attributable to the presence and threats of armed individuals deputizing themselves with police duties. In addition or alternatively, Defendants City of Kenosha and County of Kenosha failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Kenosha Police Department and the Kenosha County Sheriff's Department, with respect to the foregoing topics.

163. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the City of Kenosha and County of Kenosha, including the Defendants.

164. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendants City of Kenosha and County of Kenosha had notice of widespread practices by officers and agents of the Kenosha Police Department and Kenosha County Sheriff's Department to discriminate and retaliate against racial minorities and their allies, and against protestors challenging discriminatory and violent conduct by police officers including members of the Kenosha Police Department and Kenosha County Sheriff's Department; and to favor the views of "pro-police" groups such as the Kenosha Guard and the other armed individuals; and to subject favored and disfavored groups to different treatment.

165. These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Kenosha and County of Kenosha directly encouraged and were thereby the moving force behind the very type of misconduct at issue.

166. The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Kenosha and County of Kenosha, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

167. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Kenosha and County of Kenosha in that the constitutional violations committed against Grosskreutz were committed with the knowledge or approval of persons with final policymaking authority for the City of Kenosha and County of Kenosha or were actually committed by persons with such final policymaking authority.

168. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Kenosha and County of Kenosha, including but not limited to Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## EIGHTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

169. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

170. In the manner described in this Complaint, Defendants engaged in extreme and outrageous conduct.

171. Defendants' actions set forth above were rooted in an abuse of power or authority.

172. Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and serious bodily injury, and with reckless disregard of that probability.

173. Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

174. Defendants' conduct intentionally or recklessly caused severe emotional distress to another.

## NINTH CLAIM FOR RELIEF
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

175. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

176. In the manner described in this Complaint, Defendants were negligent. Plaintiff was impacted by the incidents related to Defendants' negligence.

177. Plaintiff suffered serious emotional distress of the type that a reasonable person would expect to occur.

178. As a direct and proximate result of the conduct referenced above, Grosskreutz suffered injuries, including emotional distress and serious bodily injury.

## TENTH CLAIM FOR RELIEF
## NEGLIGENCE

179. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

180. Defendants had a duty to Grosskreutz and the other protestors to act with ordinary care and prudence so as not to cause harm or injury to Grosskreutz.

181. By engaging in the manner described in this Complaint, Defendants failed to act with ordinary care and breached their duty of care owed to Grosskreutz.

182. As a direct and proximate result of the conduct referenced above, Grosskreutz suffered injuries, including emotional distress and serious bodily injury.

## ELEVENTH CLAIM FOR RELIEF
## NEGLIGENT HIRING, SUPERVISION, AND TRAINING

183. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

184. Grosskreutz suffered damages from foreseeable misconduct of employees and agents supervised by Defendants.

185. The Defendants' employees in supervisory roles had a duty to properly supervise officers and to oversee their treatment of Grosskreutz and other protestors.

186. Defendants blatantly disregarded the high probability that, by permitting their officers and agents to deputize and conspire with armed individuals, Grosskreutz would suffer injuries including serious bodily injury. Defendants were therefore negligent in their non-discretionary duties to supervise individual officers in their agencies.

187. As a direct and proximate result of the negligent supervision described above, Grosskreutz suffered injuries, including emotional distress and serious bodily injury.

## TWELFTH CLAIM FOR RELIEF
## BATTERY

188. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

189. In the manner described in this Complaint, Defendants intentionally and unjustifiably caused bodily harm to Gaige Grosskreutz.

190. The described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

191. As a direct and proximate result of the battery described above, Grosskreutz suffered injuries, including emotional distress and serious bodily injury.

### THIRTEENTH CLAIM FOR RELIEF
### ASSAULT

192. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

193. In the manner described in this Complaint, Defendants intentionally and unjustifiably threatened serious bodily harm to Gaige Grosskreutz.

194. The described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

195. As a direct and proximate result of the battery described above, Grosskreutz suffered injuries, including emotional distress and serious bodily injury.

### FOURTEENTH CLAIM FOR RELIEF
### RESPONDEAT SUPERIOR

196. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

197. In committing the acts alleged in the preceding paragraphs, Defendants Miskinis, Beth and John Doe Police Officers were members of the City of Kenosha and County of Kenosha, acting at all relevant times within the scope of their employment and under color of law.

198. Defendants City of Kenosha and County of Kenosha are liable as principals for all torts committed by their agents.

**FIFTEENTH CLAIM FOR RELIEF**
**INDEMNIFICATION**

199. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

200. Wisconsin law, Wisc. Stat. §895.46, requires public entities to pay any tort judgment for damages for which employees are liable within the scope of their employment activities.

201. During all times relevant to this complaint, Defendants Miskinis, Beth and John Doe Police Officers were employees of the City of Kenosha and County of Kenosha, respectively, who acted within the scope of their employment in committing the acts described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendants, and award him all relief allowed by law, including but not limited to the following:

A. All appropriate relief at law and equity;

B. For compensatory damages;

C. For punitive damages;

D. For pretrial interest;

E. For attorney's fees and costs;

F. Equitable and injunctive relief to prevent future violations of the law; and

G. An order awarding such other and further relief as the Court deems just and equitable.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 14th day of October 2021.

/s/ Kimberley Cy. Motley
Kimberley Cy. Motley, #1047193
MOTLEY LEGAL SERVICES
P.O. Box 1433
Matthews, NC 28106
(704) 765-4887
kmotley@motleylegal.com

/s/ E. Milo Schwab
E. Milo Schwab, #47897
Ascend Counsel, LLC
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.co

ATTORNEYS FOR PLAINTIFF