# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF EASTERN WISCONSIN

Civil Action No. 2:21-cv-01192-LA

GAIGE GROSSKREUTZ;

      Plaintiff;

v.

THE CITY OF KENOSHA, a municipal corporation;
KENOSHA COUNTY, a municipal corporation;
DAVID BETH, in his individual and official capacities;
DANIEL MISKINIS, in his individual and official capacities;
JOHN & JANE DOE POLICE OFFICERS 1-100, in their individual capacities;
COUNTY OF WAUKESHA;
COUNTY OF RACINE;
COUNTY OF SAUK;
COUNTY OF WALWORTH;
COUNTY OF WASHINGTON;
VILLAGE OF MENOMONEE FALLS;
CITY OF WEST ALLIS; and
KYLE RITTENHOUSE;

      Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Gaige Grosskreutz, by and through his attorneys, Kimberley Motley of Motley Legal Services and E. Milo Schwab of Ascend Counsel, LLC, respectfully alleges for his Amended Complaint and Jury Demand as follows:

# INTRODUCTION

1. "We appreciate you guys - we really do."

2. These were the words of Kenosha law enforcement officers - words of encouragement and thanks, given to Kyle Rittenhouse and his band of white nationalist vigilantes on the evening of August 25, 2020.

3. On August 25, 2020, in Kenosha, Wisconsin, Plaintiff Gaige Grosskreutz was participating in protests against police violence, which were sparked by the police shooting of Jacob Blake two days earlier. Mr. Blake was a Black man who had been shot in the back seven times by an officer in the Kenosha Police Department, and Mr. Grosskreutz was among many who peacefully protested the shooting and Kenosha's pattern of racist and violent behavior by police officers and other officials.

4. During the protests, private citizens took up arms and patrolled the streets of Kenosha, acting as law enforcement agents. Many of them had posted racist messages and threatened violence on social media before descending upon Kenosha. They made their plans known to law enforcement officials.

5. These armed individuals were not Kenosha business owners whose property had been damaged, nor were they hired by any of those businesses to come protect their property.

6. One of these armed individuals was Defendant Kyle Rittenhouse, who was then 17 years old. He crossed into Wisconsin from Illinois, carrying an assault rifle on the streets of Kenosha, in open violation of the law.

7. Astonishingly, the Kenosha Police Department, Kenosha County Sheriff's Department, their supervising officials and police officers, and law enforcement officers from

2

surrounding communities did not treat Defendant Rittenhouse or any of the other armed individuals patrolling the streets as a threat to the safety of themselves or the citizens they were sworn to protect.

8. Instead, the law enforcement Defendants deputized these armed individuals, conspired with them, and ratified their actions by letting them patrol the streets, armed with deadly weapons, to mete out justice as they saw fit. In addition, the law enforcement Defendants thanked Defendant Rittenhouse and other armed individuals, gave them water, and allowed them to openly defy the emergency curfew order that was in place. The law enforcement Defendants even made plans to funnel the protestors toward the armed individuals "deal with them."

9. As a result, Defendant Rittenhouse fired his assault rifle indiscriminately multiple times at citizens on the street. He shot and killed two men, seriously injured a third, and narrowly missed a fourth. At the time Defendant Rittenhouse encountered Gaige Grosskreutz, Defendant Rittenhouse had already killed two men.

10. Mr. Grosskreutz tried to end Defendant Rittenhouse's homicidal rampage.

11. Defendant Rittenhouse had first killed Joseph Rosenbaum, an individual who had confronted Defendant Rittenhouse wandering the streets pointing a weapon of war at protesters.

12. Defendant Rittenhouse shot him four times, including once in the head.

13. Instead of rendering aid to Mr. Rosenbaum, Defendant Rittenhouse fled.

14. Defendant Rittenhouse's fleeing was all the more galling because he was standing only two hundred yards from a hospital.

3

15. When the protesters saw him fleeing, they called for him to stop. He kept running, pointing his AR-15 at protesters as he ran.

16. One protester, a Black man who had watched Defendant Rittenhouse kill Mr. Rosenbaum, chased Rittenhouse in an effort to protect others from the violence he had just watched at the hands of Rittenhouse.

17. This individual did not have a weapon.

18. This individual did not reach for Defendant Rittenhouse - his hands were in his pocket.

19. Instead he tried to kick Mr. Rittenhouse's weapon out of his hands.

20. Mr. Rittenhouse fired his gun at this man twice.

21. Defendant Rittenhouse tried to kill this man without any possible basis for believing that his life was in danger.

22. Having seen this intent to kill with his own eyes, Anthony Huber tried to disarm Defendant Rittenhouse.

23. Mr. Huber had heard that Rittenhouse had already killed and watched him shoot at an unarmed person - so Mr. Huber clearly understood that this was a violent individual.

24. Defendant Rittenhouse then shot Mr. Huber in the chest, killing him instantly.

25. Plaintiff Gaige Grosskreutz watched all of this happen.

26. He approached with his hands in the air to try to ease the situation and stop the killing.

27. Defendant Rittenhouse instead shot Mr. Grosskreutz in the bicep, leaving a gaping wound.

28. Thankfully, Mr. Grosskreutz did not die that day.

4

29.  But he must live with the physical and emotional wounds inflicted by Defendant

Rittenhouse and the Defendants who deputized and enabled him.

30.  The conduct of the Defendants in this case directly caused Gaige Grosskreutz's injury.

## JURISDICTION AND VENUE

31.  Jurisdiction of this Court is invoked pursuant 28 U.S.C. §§1331 and 1343(a).

32.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28

U.S.C. §1367(a) because they are part of the same case and controversy described by

Plaintiff's federal claims.

33.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving

rise to the claims occurred in this District.

## PARTIES

34.  Plaintiff Gaige Grosskreutz is a citizen of the United States who resides in the state of

Wisconsin.

35.  Defendant City of Kenosha is a municipality in the state of Wisconsin. Kenosha

operates the Kenosha Police Department ("KPD"), which in turn sets city-wide policies

for the conduct of police officers employed by the City of Kenosha.

36.  Defendant Kenosha County is a municipality in the state of Wisconsin. Kenosha

County operates the Kenosha County Sheriff's Department, which in turn sets policies

for the conduct of sheriff's deputies employed by the Kenosha County Sheriff's

Department.

37.  Defendant DAVID G. BETH was the duly elected Sheriff of Kenosha County,

Wisconsin. Defendant Beth had the authority to make and enforce policies of the

5

Kenosha County Sheriff's Department. Mr. Beth is sued in his individual and official capacities.

38.  Defendant DANIEL G. MISKINIS was the Chief of Police for the Kenosha Police Department. Defendant Miskinis had the authority to make and enforce policies of the Kenosha Police Department. Mr. Miskinis is sued in his individual and official capacities.

39.  Defendants JOHN DOE POLICE OFFICERS are unknown law enforcement officers employed by the Kenosha Police Department, Kenosha County Sheriff's Department, Waukesha County Sheriff's Department, Racine County Sheriff's Department, Sauk County Sheriff's Department, Walworth County Sheriff's Department, Washington County Sheriff's Department, Menomonee Falls Police Department, and West Allis Police Department, who were deployed to respond to the protests on August 25, 2020.

40.  Defendant COUNTY OF WAUKESHA is a governmental entity within the State of Wisconsin, an arm of which is the Waukesha County Sheriff's Department, which in turn sets policies for the conduct of sheriff's deputies employed by the Waukesha County Sheriff's Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

41.  Defendant COUNTY OF RACINE is a governmental entity within the State of Wisconsin, an arm of which is the Racine County Sheriff's Department, which in turn sets policies for the conduct of sheriff's deputies employed by the Racine County Sheriff's Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

6

42. Defendant COUNTY OF SAUK is a governmental entity within the State of Wisconsin, an arm of which is the Sauk County Sheriff's Department, which in turn sets policies for the conduct of sheriff's deputies employed by the Sauk County Sheriff's Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

43. Defendant COUNTY OF WALWORTH is a governmental entity within the State of Wisconsin, an arm of which is the Walworth County Sheriff's Department, which in turn sets policies for the conduct of sheriff's deputies employed by the Walworth County Sheriff's Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

44. Defendant COUNTY OF WASHINGTON is a governmental entity within the State of Wisconsin, an arm of which is the Washington County Sheriff's Department, which in turn sets policies for the conduct of sheriff's deputies employed by the Washington County Sheriff's Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

45. Defendant VILLAGE OF MENOMONEE FALLS is a governmental entity within the State of Wisconsin, an arm of which is the Menomonee Falls Police Department, which in turn sets policies for the conduct of officers employed by the Menomonee Falls Police Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

46. Defendant CITY OF WEST ALLIS is a governmental entity within the State of Wisconsin, an arm of which is the West Allis Police Department, which in turn sets

policies for the conduct of officers employed by the West Allis Police Department. The department deployed officers and equipment to respond to and control the protests on the evening of August 25, 2020.

47. Hereinafter, all the law enforcement officers and departments set forth above are referred to, collectively, as the "Law Enforcement Defendants."

48. Hereinafter, the Waukesha County Sheriff's Department, Racine County Sheriff's Department, Sauk County Sheriff's Department, Walworth County Sheriff's Department, Washington County Sheriff's Department, Menomonee Falls Police Department, and West Allis Police Department, and their officers, are referred to as "Additionally Responding Departments" or "Additionally Responding Officers."

49. Hereinafter, the City of Kenosha, County of Kenosha, County of Waukesha, County of Racine, County of Sauk, County of Walworth, County of Washington, Village of Menomonee Falls, and City of West Allis are referred to as the "Municipal Defendants."

50. Defendant KYLE RITTENHOUSE is a citizen of Illinois who shot and injured Gaige Grosskreutz on August 25, 2020.

## FACTS

### Kenosha Police Shoot Jacob Blake, Sparking Protests

51. On August 23, 2020, in Kenosha, Wisconsin, KPD officer Rusten Sheskey shot Jacob Blake in the back seven times without justification.

52. Neighbors and other concerned residents of Kenosha demonstrated in protests against the shooting of Jacob Blake. Demonstrators initially gathered at the site where Mr.

Blake was shot. When video of the KPD's shooting of Blake was released, it rightly sparked public outrage. That evening hundreds of additional demonstrators gathered in downtown Kenosha to protest.

53. Officers from the KPD and the KCSD were dispatched to monitor the demonstrations, police the actions of individuals present, and disperse the crowds.

54. The KPD and KCSD officers at the scene were antagonistic toward the demonstrators, who were voicing their outrage at the racist and systemic violence conducted by the very officers who were policing the demonstrations.

55. An emergency overnight curfew of 10:15 p.m. was put in place. The curfew was aimed at protestors and not actually directed at, or enforced against, others in the City violating the order.

56. Officers from the KPD and KCSD fired tear gas and rubber bullets into the crowds to break up the demonstrations, and they arrested many demonstrators.

57. On Monday, August 24, 2020, the demonstrations continued. Defendant Beth put in place an 8 p.m. curfew. Again, the curfew was aimed at protestors.

58. That curfew remained in effect on August 25, 2020.

**KPD and KCSD Coordinate Their Response and Control of the Protests with Departments and Officers from Neighboring Communities**

59. On August 25, 2020, in addition to the officers from KPD and KCSD, the Additionally Responding Departments deployed officers and equipment to participate in the response and control of the protests in Kenosha. The Additionally Responding Officers joined forces with the KPD and KCSD and worked under their coordination and tactical command.

60. The Waukesha, Racine, Sauk, Walworth and Washington County Sheriff's Departments deployed Special Weapons and Tactics (SWAT) teams to coordinate with KPD and KCSD to respond to and control the protests in Kenosha.

61. In addition to officers, the Additionally Responding Departments also deployed equipment, including service weapons and crowd control tools such as pepper spray, tear gas and so-called non-lethal weapons such as bean bag shotguns and rubber bullets. The Additionally Responding Departments also provided armored military vehicles designed for use in war, including BearCats and Mine-Resistant Ambush Protected trucks (MRAPs).

62. At various times, KPD, KCSD and the Additionally Responding Departments used all these tools on or against protestors.

63. Tear gas is a chemical weapon that the United States military is banned from using under the 1925 Geneva Protocol and the United Nations Chemical Weapons Convention that went into effect in 1997. The KPD, KCSD, and Additionally Responding Departments deployed it repeatedly on protestors in Kenosha between August 23 and 25.

64. On the night of August 25, the Additionally Responding Officers all coordinated with and acted under a shared tactical command with KPD and KCSD.

**Defendants Know Armed Individuals Plan to Patrol
Kenosha and Have Threatened Harm to Citizens**

65. The demonstrations continued into August 25, 2020.

10

66. That evening, armed individuals descended on Kenosha. They could be seen patrolling the streets in and around the demonstrations, brandishing weapons, threatening residents, and pointing weapons at peaceful demonstrators without provocation.

67. The armed individuals had arrived in part based on a Facebook post by Kevin Mathewson on behalf of a militia group he formed called the Kenosha Guard. Mathewson put out a call on Facebook for "patriots willing to take up arms and defend our City tonight against the evil thugs." He received hundreds of online responses, including many hundreds of people indicating that they would be attending.

68. The responders to Mathewson's post made clear that they intended to patrol the demonstration armed, and with the intent to kill. Responses included the following:

    a. "Counter protest? Nah. I fully plan to kill looters and rioters tonight. I have my suppressor on my AR [Assault Rifle], these fools won't even know what hit them."

    b. "It's about time. Now it's time to switch to real bullets and put a stop to these impetuous children rioting."

    c. "Use hollow points, they expand on contact."

    d. "Armed and ready. Shoot to kill tonight."

69. Law Enforcement Defendants knew about the plans and intentions of the armed individuals, including the social media posts, and the plans and intentions of the pro militia armed individuals that descended on downtown Kenosha.

70. Mathewson is a former Kenosha alderman, was known to the Defendants, and speaks regularly with Defendant Miskinis.

11

71. Mathewson, calling himself the Commander of the Kenosha Guard, emailed Defendant Miskinis and Joseph Nosalik, KPD's Public Information Officer. The email stated, "Chief Miskinis: As you know, I am the Commander of the Kenosha Guard, a local militia. We are mobilizing tonight and have about 3,000 RSVP's. We have volunteers that will be in Uptown, downtown, and at the entrances to other neighborhoods." Matthewson also posted the email as an open letter to the Kenosha Chief of Police on social media.

72. The email and social media post made clear that these "volunteers" would not be there to protect their own homes or businesses, and that they had not been hired by any local business to secure property. Instead, they intended to patrol the streets, acting as armed law enforcement officials.

73. Neither Defendant Miskinis nor Defendant Beth made any attempt to dissuade Mathewson or any other armed individuals from showing up in Kenosha to patrol the streets.

74. Defendants Miskinis and Beth acknowledged that the KPD and KCSD were aware that pro-militia, armed individuals intended to patrol and then did patrol downtown Kenosha.

75. The Additionally Responding Departments and their Officers were also fully aware that there were pro-militia armed individuals were patrolling downtown Kenosha. This was obvious to them when on scene. Indeed, one of the Additionally Responding Officers wrote in his report from the night of August 25, 2020 that "throughout the night" they

observed pro-militia groups "armed, mostly with long guns in the area of 60th and Sheridan."

**Defendant Rittenhouse Shoots Gaige Grosskreutz and Kills Two Others**

76.   Among the armed individuals who arrived in Kenosha on August 25 was Defendant Kyle Rittenhouse.

77.   Defendant Rittenhouse was a 17-year-old from Antioch, Illinois.

78.   By his appearance, Defendant Rittenhouse was obviously a minor.

79.   Defendant Rittenhouse possessed a Smith & Wesson AR-15 style .223 rifle, with a magazine holding 30 rounds of ammunition. This weapon was developed in the late 1950s as a weapon of war.

80.   Defendant Rittenhouse was brandishing his gun openly and conspicuously, strapping it over his shoulder using a tactical sling designed to position the rifle at the center of his chest for rapid elevation and positioning. The rifle was visible at all times across his body or in his hands.

81.   Defendant Rittenhouse was in clear violation of the law, which prohibits a minor from possessing or displaying such a gun.

82.   Numerous KPD and KCSD officers saw Defendant Rittenhouse before and after the shootings that night, as did many of the Additionally Responding Officers. Despite being in clear violation of Wisconsin law, Defendant Rittenhouse was not asked for identification, was not questioned, was never detained, and was not disarmed.

83. Instead, the Law Enforcement Defendants allowed Defendant Rittenhouse to patrol the streets of downtown Kenosha with his deadly assault rifle, they invited him in, deputized him, conspired with him, and ratified his actions.

84. As a result of the Law Enforcement Defendants' actions, within the zone they controlled, Defendant Rittenhouse shot at four Kenosha-area residents, killing two of them and seriously injuring a third.

85. At around 11 p.m., without provocation or any legal justification, Defendant Rittenhouse pointed his gun at an unarmed demonstrator heading to his car to go home.

86. Around 11:45 p.m., Defendant Rittenhouse shot Joseph Rosenbaum in the parking lot of an auto dealership. Rosenbaum was killed.

87. Instead of seeking medical attention, or any other form of aid, Defendant Rittenhouse called his friend Dominic Black, told Black that he had just killed someone, and then ran.

88. Defendant Rittenhouse ran from the scene of the Rosenbaum shooting with his assault rifle in his hands, holding it in a ready position. People were yelling that Defendant Rittenhouse had just shot someone.

89. Defendant Rittenhouse stumbled and fell to the ground, and several citizens approached him in an attempt to disarm him.

90. The first individual was a Black man who had witnessed Defendant Rittenhouse kill his first victim.

91. This man had no weapon and did not reach for Defendant Rittenhouse's weapon.

92. Instead, he merely tried to kick the gun out of Defendant Rittenhouse's hands.

93.    Defendant Rittenhouse shot at him twice, both times aiming for his head.

94.    After being shot at twice, this first individual ran away, fearing for his life.

95.    Anthony Huber approached Defendant Rittenhouse to disarm him, stop the shooting, and save the lives of others.

96.    As Mr. Huber was reaching for Defendant Rittenhouse's rifle to pull it away, without provocation or any legal justification, Defendant Rittenhouse shot him in the chest.

97.    After Mr. Huber was shot, Plaintiff Gaige Grosskreutz approached Defendant Rittenhouse with his hands up, pleading with him to stop his shooting rampage. Without provocation or any legal justification, Defendant Rittenhouse shot at Grosskreutz from point-blank range, hitting him in the arm. Thankfully, Grosskreutz survived.

98.    As a result of this shooting, Mr. Grosskreutz suffered a serious bodily injury and has suffered emotional distress.

**The Law Enforcement Defendants Authorize Defendant Rittenhouse's Shootings**

99.    The Law Enforcement Defendants did nothing to stop Defendant Rittenhouse's illegal conduct. They did not arrest him for illegally carrying a gun. They did not disarm him. They did not limit his movement in any way. They did not question him. They did not stop him from shooting individuals after he started. They did not arrest him, detain him, or question him even after he had killed two people.

100.   Instead, the Law Enforcement Defendants deputized Defendant Rittenhouse and other armed individuals, conspired with them, and ratified their actions by allowing them to

patrol the streets armed illegally with deadly weapons and shoot and kill innocent citizens.

101. Among other things, the Law Enforcement Defendants directed their curfew order only at people protesting the Law Enforcement Defendants' own police violence, and not at Defendant Rittenhouse and others, who were supporters of law enforcement.

102. Defendant Rittenhouse and others were subject to a different set of rules and were allowed to move about freely in areas controlled by the Law Enforcement Defendants.

103. For example, at 9:57 p.m., a Kenosha Police Sergeant sent a message to all officers through the Department's internal messaging system noting the presence of armed individuals patrolling the streets in violation of the curfew order.

104. The Additionally Responding Officers were also fully aware of the presence of armed individuals patrolling the streets in violation of the curfew order, based on their observation of their presence "throughout the night" and their participation in a coordinated tactical command.

105. Rather than take any steps to detain, dissuade, or disarm these armed individuals, a KPD Sergeant made clear that the pro-police armed individuals were not to be detained, dissuaded, or disarmed, calling the armed individuals in blatant violation of the curfew order "very friendly."

106. Likewise, at 11:26 p.m., callers reported that some of the pro-police armed individuals had "slashed tires" in a nearby area. But the Defendants did nothing in response to this conduct, let alone arrest the perpetrators.

16

107. To the contrary, one of the Additionally Responding Officers, on a text thread with others titled "Tactical Enforcement Unit Command Only" wrote, "Gotta love counter protestors. Slashing tires."

108. Instead, at approximately 11:30 p.m., about fifteen minutes before Defendant Rittenhouse shot Rosenbaum, Huber, and Grosskreutz, several Law Enforcement Defendants were talking to Defendant Rittenhouse and the other armed individuals who had congregated in the parking lot of a private business.

109. Despite the fact that the armed individuals were in violation of the curfew order, the officers and deputies communicated their full support and appreciation for Defendant Rittenhouse and others.

110. In video footage taken at the scene, officers can even be heard asking armed individuals if they needed water. Defendant Rittenhouse can be seen telling the officers that they did need water, which officers gave them.

111. Defendant Rittenhouse walked right up to the police vehicles. Despite his obviously tender age, he was not asked for identification to demonstrate that he could lawfully possess an assault rifle.

112. Officers working for the Law Enforcement Defendants not only provided armed individuals with water, but they voiced their support and appreciation for the actions of Defendant Rittenhouse and others, saying: "We appreciate you guys, we really do."

113. Needless to say, the Law Enforcement Defendants did not offer assistance or appreciation to any protestors. At the same time the officers were handing out assistance and praise to the armed individuals, including Defendant Rittenhouse, they

17

can be heard over loudspeakers in their armored vehicles ordering the protestors to disperse: "This is the last warning. You will disperse." And: "This area is closed, you are trespassing, leave now."

114. No such warnings or threats were made to the armed individuals.

115. The Law Enforcement Defendants deliberately orchestrated these circumstances. A clear message was sent that perceived protestors were required to disperse, while armed individuals who supported law enforcement could roam free and assist the officers. These events directly led to Anthony Huber's death.

116. Before the fatal shootings, one of the armed individuals was interviewed. He said the following: "You know what the cops told us today? They were like, 'We're gonna push 'em down by you, 'cause you can deal with them, and then we're gonna leave.'"

117. And that is exactly what happened. The Law Enforcement Defendants, including the commanders for these police forces, ordered the protestors to move south, funneling them into a confined area, where they were met by the violence perpetrated by Defendant Rittenhouse and the other armed individuals.

118. Internal communications and reports from members of the Law Enforcement Defendants reveal that they knew the pro-police armed individuals had gathered around 60th and Sheridan, yet they deliberately funneled protestors out of the park near 56th and Sheridan and forced them South right into the militia group they knew to be pro-police, in violation of the curfew order, slashing tires, and armed with long guns.

119. The commanders for the Law Enforcement Defendants knew that the act of funneling protesters towards their co-conspiractors - the right wing militias including Rittenhouse - created a dangerous situation.

120. One of the protesters funneled by Defendants was Plaintiff Gaige Grosskreutz.

121. Defendants' conduct in funneling the protesters left Plaintiff Grosskreutz with no choice but to enter this confined area.

122. Plaintiff Grosskreutz and other individuals had no apparent means of escape. The Law Enforcement Defendants funneled protesters towards this militia while cutting off routes to leave. Only the militia members could move across police lines.

123. At all times, the Law Enforcement Defendants, Defendant Rittenhouse, and others knew and understood what it meant when they told heavily armed private citizens to "deal with" the protestors. In this manner, the Law Enforcement Defendants, Defendant Rittenhouse, and others arrived at a plan to collectively use force and state authority against the protestors.

124. For example, Defendant Rittenhouse's own lawyers stated that the police "maneuvered a mass of individuals down the street towards the auto shops" where the armed individuals had gathered.

125. As a result, the Law Enforcement Defendants invited, deputized, authorized, conspired with, and ratified the actions of Defendant Rittenhouse, a boy illegally in possession of an assault rifle, who roamed the street in violation of an emergency curfew order, shooting innocent civilians, killing two, seriously injuring a third, and narrowly missing a fourth.

126. To make matters worse, when Huber and Grosskreutz were shot, the Law Enforcement Defendants were at the scene. Protestors yelled to the officers that Defendant Rittenhouse had just shot people. Remarkably, the officers did nothing to stop Defendant Rittenhouse, let alone question him, or arrest him. Instead, officers spoke to Defendant Rittenhouse and then let him walk away.

127. The only reason the Law Enforcement Defendants allowed Defendant Rittenhouse to walk away after shooting three people was because he was white and because he was affiliated with the armed individuals, who had the Law Enforcement Defendants' explicit support.

128. By inviting, deputizing, conspiring with, and ratifying the actions of armed individuals, who were empowered to patrol the streets of Kenosha, the Law Enforcement Defendants created an extremely and obviously dangerous and deadly environment, which led directly and foreseeably to the shootings of Gaige Grosskreutz and others.

129. The Law Enforcement Defendants' open support of and coordination with the armed individuals in the minutes and hours before the shootings deprived Gaige Grosskreutz and the other protestors of the basic protections typically provided by police. It was a license for the armed individuals to wreak havoc and inflict injury.

130. Defendant Rittenhouse's own lawyers have blamed the shootings on the Law Enforcement Defendants, highlighting their "abject failure to ensure basic law and order to citizens."

131. The Law Enforcement Defendants continued their disparate treatment of Black people, even after the deaths of Huber and Rosenbaum. For example, Defendant Miskinis

refused to publicly condemn the crimes of Defendant Rittenhouse or the other armed individuals, and instead has ratified that misconduct. Indeed, he has defended the armed individuals as citizens exercising their constitutional rights. The protestors received the opposite treatment from Defendant Miskinis.

132. Moreover, in his first press conference after the shooting, Defendant Miskinis refused to make any statements condemning or even dissuading the armed individuals, even when he was specifically asked if he wanted armed vigilante groups to be present again the next night of protests.

### Racial Discrimination and Viewpoint Discrimination

133. If Defendant Kyle Rittenhouse were Black, the Law Enforcement Defendants would have acted much differently.

134. If a Black person had approached police with an assault rifle, offering to patrol the streets with the police, he most likely would have been shot dead.

135. If a Black man had shot three citizens with an assault rifle and was seen walking away from the scene of the shooting with the assault rifle in hand, while other citizens yelled he was an active shooter, he would have been shot dead.

136. In none of these circumstances would the Law Enforcement Defendants have permitted the individual to roam the streets, illegally and heavily armed, shoot civilians, and then walk past a dozen officers, talk to them, and simply go home.

137. One need not look any further than the very event that gave rise to the protest at which Gaige Grosskreutz was maimed: although Jacob Blake was not at the site of a shooting, possessed no gun, brandished no weapon, had not shot or hurt anyone, and was

21

climbing into his own car with two children, Blake was shot in the back seven times by officers employed by Defendant KPD.

138.  By contrast, Defendant Rittenhouse was walking away from the scene of a double homicide with an assault rifle in his arms, and he was permitted to simply walk away.

139.  Jacob Blake is Black. Defendant Kyle Rittenhouse is White.

140.  Moreover, the demonstrators were a diverse group of citizens protesting police violence against Black people, which included many Black-Americans and other people of color. They were protesting, in part, the racial discrimination of Defendants KPD and KCSD, and their officers, as exemplified by the shooting of Jacob Blake.

141.  The armed individuals were all White.

142.  Similarly, the protestors were advocating a viewpoint critical of the police, including Defendants KPD and KCSD. The armed individuals espoused a viewpoint that was avowedly pro-police.

143.  The difference in treatment of the two groups was stark. The White, pro-police armed individuals were allowed by the Law Enforcement Defendants to patrol the streets with weapons of war, participating in the police action, and threatening and inflicting violence on innocent civilians; while the diverse group of protestors criticizing police actions were ordered to disperse because they were violating the curfew order. No such orders were given to the pro-police individuals, who were in violation of the curfew as well, and known to be slashing tires.

144.  The reaction of some of the Law Enforcement Defendants to the shooting of three individuals by one of the pro-police armed individuals was openly callous. One of them

texted on the night of August 25, shortly after Grosskreutz and the others had been shot by Defendant Rittenhouse, "Listening to the gun fire. Such a nice night." He then linked to a livestream of the shooting on Twitter, and texted, "Nice video."

145. The protestors were also treated differently than the armed individuals in terms of who was subject to arrest. In the days after the protests began, more than 150 protestors were arrested for allegedly violating the curfew order. Not even a single one of the armed individuals was arrested by the Law Enforcement Defendants for violating the same curfew order.

146. Many of the armed individuals with whom the Law Enforcement Defendant departments had allied themselves were avowed racists.

147. Among the armed individuals present at the protests was Ryan Balch, a member of the Boogaloo Bois who could be seen patrolling the streets with Defendant Rittenhouse. The Boogaloo Bois are a right-wing militia group whose adherents include neo-Nazis and white supremacists. According to Balch, as many as 32 members of the Boogaloo Bois were in Kenosha patrolling the streets.

148. In the months after he killed two people and maimed Mr. Grosskreutz, Defendant Rittenhouse was seen in a bar in his hometown flashing an "OK" sign, a symbol of white supremacy/white power.

149. Later, he would fly to Miami, Florida to meet with Enrique Tarrio, the national leader of the Proud Boys movement - an avowedly racist and violent right-wing organization.

150. Defendant KPD's support of, and coordination with, the armed individuals was a product of its systemic, racially discriminatory policies and practices.

23

151. The KPD has just eight Black police officers, out of a force of more than 200 officers. It has never had a Black person in top leadership positions, including police chief, assistant chief, or police inspector.

152. Christopher Carter, a former Black police officer in the KPD who retired in 2011, has said he was consistently subject to racist aggression, including being called a "n*****," was discriminated against during his time at the KPD, and witnessed racist policing practices toward civilians.

153. In a recent article in the Washington Post, six current and former officers described a department at odds with people of color, both inside and outside its ranks, with some officers routinely using racist language and excessive force." One of the former officers stated, "You have officers there who openly admit to pulling someone over because they're Black and driving a nice car. And these are officers who train new officers."

154. Just eleven days before Jacob Blake was shot, a woman was arrested for filming police officers engaging in threats and physical abuse during the arrest of a Black man. Her video footage captured a KPD officer punching a man in the ribs twice after he had already been handcuffed. When she was ordered to disperse, she responded, "We're not moving until we know he's safe!" An officer responded, "Do you want to get shot?"

155. For his part, Defendant Beth has his own history of racially discrimination conduct as the Kenosha County Sheriff. In 2018, two Black women and three Black men were apprehended after a shoplifting incident and a high-speed chase. The youngest individual arrested was 16 years old. In comments after the arrest, Defendant Beth

stated that it was time to "stop being politically correct," and that "these people have to be warehoused."

**LEGAL CLAIMS**

**COUNT I:**
**42 U.S.C. §1983**
**CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS**
**(Against All Defendants)**

156. Each paragraph of this Complaint is incorporated as if restated fully herein.

157. Defendants acting in concert with each other and other co-conspirators—including Defendant Rittenhouse, Mathewson, members of the Kenosha Guard and other non-party armed individuals—reached an agreement among themselves to deprive Grosskreutz of his constitutional rights, all as described in the various paragraphs of this Complaint.

158. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Grosskreutz of these rights.

159. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

160. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

161. As a direct and proximate result of the illicit prior agreement referenced above, Grosskreutz's rights were violated and he suffered injuries, including physical pain and emotional distress.

162. Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; and by employees and contractors of the Kenosha Police Department, Kenosha County Sheriff's Department, Additionally Responding Departments, and including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; the Municipal Defendants; and Defendant Rittenhouse.

163. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Municipal Defendants, the Kenosha Police Department, the Kenosha County Sheriff's Department, and the Additionally Responding Departments, in the manner more fully described below in Count VII.

## COUNT II:
### 42 U.S.C. §1985(3)
### CONSPIRACY TO OBSTRUCT JUSTICE BASED
### ON INVIDIOUS DISCRIMINATION
### (Against All Defendants)

164. Each paragraph of this Complaint is incorporated as if restated fully herein.

165. Defendants are "persons" as that term is used in 42 U.S.C. §1985.

166. Defendants, acting in concert with each other and other co-conspirators—including Defendant Rittenhouse, Mathewson, members of the Kenosha Guard and other non-party armed individuals—reached an agreement among themselves to deprive

26

Grosskreutz of his constitutional rights and equal protection of the laws, all as described in the various paragraphs of this Complaint.

167. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Grosskreutz of these rights.

168. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

169. The conspiracy between Defendants and the other co-conspirators set forth above, and the actions taken in furtherance thereof, were motivated by racial animus.

170. Specifically, working in concert with these others, Defendants targeted individuals of color and individuals allied with them in protest against racial discrimination, including Grosskreutz, by creating a dangerous environment in which injury to Grosskreutz and others was highly likely. They did this by permitting the allwhite armed individuals—many of whom had openly espoused racist and violent intentions—to taunt, threaten and monitor the diverse group of protestors, by permitting the all-White armed individuals to patrol the streets like deputized police officers, by offering the all-White armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the all-white armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the racially diverse group of protestors were arrested for violating Defendants' curfew order. Not a single one of the all-white armed individuals was arrested for violating the same curfew order.

27

171. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

172. As a direct and proximate result of the illicit prior agreement referenced above, Grosskreutz's rights were violated and he suffered injuries, including physical pain and emotional distress.

173. Plaintiff's injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; and by employees and contractors of the Kenosha Police Department, Kenosha County Sheriff's Department, Additionally Responding Departments, and including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; the Municipal Defendants; and Defendant Rittenhouse.

174. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Municipal Defendants, the Kenosha Police Department, the Kenosha County Sheriff's Department, and the Additionally Responding Departments, in the manner more fully described below in Count VII.

**COUNT III:**
**42 U.S.C. § 1983**
**EQUAL PROTECTION**
**(Against All Defendants)**

175. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

176. In the manner described in this Complaint, Defendants denied Grosskreutz equal protection of the law in violation of the Fourteenth Amendment of the United States Constitution.

177. Defendants' conduct was motivated by racial animus and constituted purposeful discrimination, and it also affected Grosskreutz and the racially diverse group of protestors in a grossly disproportionate manner as compared to similarly situated White individuals.

178. Specifically, working in concert with these others, Defendants targeted individuals of color and individuals allied with them in protest against racial discrimination, including Grosskreutz, by creating a dangerous environment in which injury to Grosskreutz and others was highly likely. They did this by permitting the allwhite armed individuals—many of whom had openly espoused racist and violent intentions—to taunt, threaten and monitor the diverse group of protestors, by permitting the all-White armed individuals to patrol the streets like deputized police officers, by offering the all-White armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the all-white armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the racially diverse group of protestors were arrested for violating the KPD and KCSD's curfew order. Not a single one of the all-White armed individuals was arrested for violating the same curfew order.

179. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

180. As a direct and proximate result of the conduct referenced above, Grosskreutz was deprived of equal protection of the laws, and he suffered injuries, including physical pain and emotional distress.

181. Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; and by employees and contractors of the Kenosha Police Department, Kenosha County Sheriff's Department, Additionally Responding Departments, and including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; the Municipal Defendants; and Defendant Rittenhouse.

182. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Municipal Defendants, the Kenosha Police Department, the Kenosha County Sheriff's Department, and the Additionally Responding Departments, in the manner more fully described below in Count VII.

## COUNT IV:
## 42 U.S.C. §1983
## FIRST AMENDMENT RETALIATION
### (Against All Defendants)

183. Each paragraph of this Complaint is incorporated as if restated fully herein.

184. In the manner described in this Complaint, Defendants subjected Grosskreutz and the other protestors to discriminatory and retaliatory treatment based on their opinions

critical of police violence, in violation of the First Amendment of the United States Constitution.

185. Grosskreutz and the other protestors participated in rallies and demonstrations in downtown Kenosha advocating a viewpoint critical of the police, including Defendants KPD and KCSD, similar to the national and worldwide protests against police violence that began in the summer of 2020. Such conduct is protected by the First Amendment of the United States Constitution.

186. The armed individuals espoused a viewpoint that was avowedly "pro-police."

187. Defendants subject Grosskreutz and other peaceful protestors to discrimination and retaliation because of their viewpoints critical of police. They did this by permitting "pro-police" armed individuals to taunt, threaten and monitor the diverse group of protestors without consequence, by permitting the "pro-police" armed individuals to patrol the streets like deputized police officers, by offering the "propolice" armed individuals assistance and praise while simultaneously ordering protestors to disperse, and by ultimately corralling the protestors and funneling them toward the "pro-police" armed individuals to "deal with them." Moreover, in the week or so after the protests began, more than 150 members of the protestors voicing criticism of racist and violent police conduct were arrested for violating KPD and KCSD's curfew order. Not a single one of the "pro-police" armed individuals was arrested for violating the same curfew order.

188. The protected speech of Grosskreutz and the other protestors, and the viewpoint critical of police that they expressed, was a motivating factor in Defendants' disparate, discriminatory, and retaliatory treatment of the protestors.

189. Defendants' retaliatory actions in response to Grosskreutz and the other protestors' protected speech have had a chilling effect that acts as a deterrent to free speech.

190. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

191. As a direct and proximate result of the conduct referenced above, Grosskreutz's First Amendment rights were violated, and he suffered injuries, including physical pain and emotional distress.

192. Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; and by employees and contractors of the Kenosha Police Department, Kenosha County Sheriff's Department, Additionally Responding Departments, and including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; the Municipal Defendants; and Defendant Rittenhouse.

193. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Municipal Defendants, the Kenosha Police Department, the Kenosha County Sheriff's Department, and the Additionally Responding Departments, in the manner more fully described below in Count VII.

**COUNT V:**
**42 U.S.C. §1983**
**DEPRIVATION OF DUE PROCESS**

**(Against All Defendants)**

194. Each paragraph of this Complaint is incorporated as if restated fully herein.

195. In the manner described in this Complaint, Defendants allowed Defendant Rittenhouse and other illegally armed individuals to patrol the streets of downtown Kenosha with deadly weapons, inviting those individuals to use police powers, deputizing them, conspiring with them, and ratifying their actions.

196. Defendants even informed Defendant Rittenhouse and these armed individuals that they would funnel demonstrators toward them to be dealt with.

197. The misconduct described in this Count increased the danger faced by Grosskreutz and other peaceful demonstrators who were present.

198. In addition, the misconduct described in this Count shocked the conscience and was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Grosskreutz and others.

199. As a direct and proximate result of the conduct referenced above, Defendant Rittenhouse shot and killed Grosskreutz.

200. Plaintiff's' injuries were caused by the actions and decisions of Defendants Beth and Miskinis, acting in their individual and official, policymaking capacities; and by employees and contractors of the Kenosha Police Department, Kenosha County Sheriff's Department, Additionally Responding Departments, and including the John Doe Police Officers, who acted at the direction of Defendants Beth and Miskinis; the Municipal Defendants; and Defendant Rittenhouse.

201. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Municipal Defendants, the Kenosha Police Department, the Kenosha County Sheriff's Department, and the Additionally Responding Departments, in the manner more fully described below in Count VII.

**COUNT VI:**
**42 U.S.C. §1983**
**FAILURE TO INTERVENE**
**(Against All Law Enforcement Defendants)**

202. Each paragraph of this Complaint is incorporated as if restated fully herein.

203. In the manner described in this Complaint, Defendants had knowledge that conspiratorial wrongs were about to be committed.

204. Each of the Defendants had the power to prevent or aid in preventing the commission of those wrongs.

205. Defendants neglected to prevent or aid in preventing these wrongful acts where the wrongful acts were committed and could have been prevented by reasonable diligence.

206. As a direct and proximate result of the conduct referenced above, Grosskreutz's constitutional rights were violated, and he suffered injuries, including physical pain and emotional distress.

207. As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent them in court proceedings and incurred expenses associated with these proceedings and prosecuting the instant case.

**COUNT VII:**
**42 U.S.C. §1983**
**Municipal Liability/Monell Policy Claim**
**(Against Municipal Defendants)**

208. Each paragraph of this Complaint is incorporated as if restated fully herein.

209. As described more fully herein, the Municipal Defendants and the Additionally Responding Departments are themselves liable for the violation of Grosskreutz's constitutional rights.

210. Plaintiff's injuries were caused by the policies, practices, and customs of the Municipal Defendants, as well as by the actions of policy-making officials for the Municipal Defendants.

211. At all times relevant to the events described above and for a period of time prior and subsequent thereto, the Municipal Defendants failed to promulgate proper or adequate rules, regulations, policies, and procedures to ensure the protection of equal protection, first amendment and other constitutional rights of protestors and other individuals engaged in demonstrations and rallies on issues of public interest; to protect protestors and other individuals engaged in demonstrations and rallies on issues of public interest, including from counter-protestors and other individuals whose actions and presence is likely to create danger and result in violence; to ensure the equal enforcement (or non-enforcement) of curfew orders; to ensure decision-making free of racial discrimination as related to the monitoring and supervision of protests and demonstrations; to ensure decision-making free of viewpoint discrimination as related to the monitoring and supervision of protests and demonstrations; to protect the free speech rights of all persons regardless of race or viewpoint; and to protect against the likely violence attributable to the presence and threats of armed individuals deputizing themselves with police duties. In addition, or alternatively, the Municipal Defendants

35

failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of their officers and agents, with respect to the foregoing topics.

212. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Municipal Defendants.

213. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the Municipal Defendants had notice of widespread practices by their officers and agents to discriminate and retaliate against racial minorities and their allies, and against protestors challenging discriminatory and violent conduct by police officers including members of the Kenosha Police Department and Kenosha County Sheriff's Department and the Additionally Responding Departments; and to favor the views of "pro-police" groups such as the Kenosha Guard and the other armed individuals; and to subject favored and unfavored groups to different treatment.

214. These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the Municipal Defendants directly encouraged and were thereby the moving force behind the very type of misconduct at issue.

215. The above widespread practices and customs, so well settled as to constitute de facto policies of the Municipal Defendants were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

216. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Municipal Defendants, in that the constitutional violations committed against Grosskreutz were committed with the knowledge or approval of persons with final policymaking authority for the Municipal Defendants or were committed by persons with such final policymaking authority.

217. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the Municipal Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VIII:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendant Rittenhouse)**

218. Each paragraph of this Complaint is incorporated as if restated fully herein.

219. In the manner described in this Complaint, Defendants engaged in extreme and outrageous conduct.

220. Defendants' actions set forth above were rooted in an abuse of power or authority.

221. Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and physical injury, and with reckless disregard of that probability.

222. Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

223. Defendants' conduct intentionally or recklessly caused severe emotional distress to another.

## COUNT IX:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
**(Against Defendants Rittenhouse, Miskinis, Beth, City of Kenosha, Kenosha County, and John Doe Defendants)**

224. Each paragraph of this Complaint is incorporated as if restated fully herein.

225. In the manner described in this Complaint, Defendants were negligent.

226. Plaintiff was impacted by the incidents related to Defendants' negligence.

227. Plaintiff suffered serious emotional distress of the type that a reasonable person would expect to occur.

228. As a direct and proximate result of the conduct referenced above, Grosskreutz suffered injuries including physical pain and emotional distress.

## COUNT X:
## NEGLIGENCE
**(Against Defendants Beth, Miskinis, City of Kenosha, Kenosha County, and John Doe Defendants)**

229. Each paragraph of this Complaint is incorporated as if restated fully herein.

230. Defendants had a duty to Grosskreutz and the other protestors to act with ordinary care and prudence so as not to cause harm or injury to Grosskreutz.

231. By engaging in the manner described in this Complaint, Defendants failed to act with ordinary care and breached their duty of care owed to Grosskreutz.

232. As a direct and proximate result of the conduct referenced above, Grosskreutz suffered injuries including physical pain and emotional distress.

## COUNT XI:
## NEGLIGENT HIRING, SUPERVISION AND TRAINING
**(Against Law Enforcement Defendants)**

38

233. Each paragraph of this Complaint is incorporated as if restated fully herein.

234. Grosskreutz suffered damages from foreseeable misconduct of employees and agents supervised by the Law Enforcement Defendants.

235. The Law Enforcement Defendants' employees in supervisory roles had a duty to properly supervise officers and to oversee their treatment of Grosskreutz and other protestors.

236. The Law Enforcement Defendants blatantly disregarded the high probability that, by permitting their officers and agents to deputize and conspire with armed individuals, Grosskreutz would suffer injuries including physical pain and emotional distress. These Defendants were therefore negligent in their non-discretionary duties to supervise individual officers in their agencies.

237. As a direct and proximate result of the negligent supervision described above, Grosskreutz suffered injuries including physical pain and emotional distress.

## COUNT XII:
## BATTERY
### (Against Defendant Rittenhouse)

238. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

239. In the manner described in this Complaint, Defendant committed unlawful conduct as a result of which Defendant Kyle Rittenhouse shot Gaige Grosskreutz.

240. In pointing his gun at Mr. Grosskreutz and ultimately shooting him, Defendant Rittenhouse placed Mr. Grosskreutz in reasonable apprehension of imminent or harmful contact.

241. Defendant Rittenhouse intended to place Mr. Grosskreutz in apprehension of imminent and harmful contact.

242. Defendant Rittenhouse shot Mr. Grosskreutz, causing harmful contact.

243. Defendant Rittenhouse intended to shoot Mr. Grosskreutz.

244. The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

245. As a result of these actions, Grosskreutz suffered severe injuries, including physical pain and emotional distress.

## COUNT XIII:
### ASSAULT
### (Against Defendant Rittenhouse)

246. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

247. In the manner described in this Complaint, Defendant committed unlawful conduct as a result of which Defendant Kyle Rittenhouse shot Gaige Grosskreutz.

248. In pointing his gun at Mr. Grosskreutz and ultimately shooting him, Defendant Rittenhouse placed Mr. Grosskreutz in reasonable apprehension of imminent or harmful contact.

249. Defendant Rittenhouse intended to place Mr. Grosskreutz in apprehension of imminent and harmful contact.

250. The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

251. As a result of these actions, Grosskreutz suffered severe injuries, including physical pain and emotional distress.

## COUNT XIV:
## RESPONDEAT SUPERIOR
### (Against Defendants City of Kenosha and Kenosha County)

252. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

253. In committing the acts alleged in the preceding paragraphs, Defendants Miskinis, Beth and John Doe Police Officers were agents, members, or employees of the Municipal Defendants, acting at all relevant times within the scope of their employment and under color of law.

254. These Defendants are liable as principals for all torts committed by their agents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

a.  All appropriate relief at law and equity;

b.  Declaratory relief and other appropriate equitable relief;

c.  Economic losses on all claims as allowed by law;

d.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

e.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

f.  Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

41

g.  Pre-and post-judgment interest at the lawful rate; and

h.  Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 14th day of February 2023.

/s/ Kimberley Cy. Motley
Kimberley Cy. Motley
Motley Legal Services
PO Box 1433
Matthews NC 28106

s/ Edward Milo Schwab
Edward Milo Schwab, #47897
Ascend Counsel, LLC
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.co

ATTORNEYS FOR PLAINTIFF

42